IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| LISA SUTER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 06-4032-CV-W-HFS |
| | ) | |
| STATE OF MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Suter and others who have joined her are inmates at the Chillicothe Correctional

Center, a women's penal institution.  Department of Corrections officials apparently consider it old

and outmoded and it will be replaced by a new facility, the construction of which could have begun

as early as September 1, 2006.  The plaintiff and two other inmates testified at a preliminary

injunction hearing in August that the two-person cells now occupied by them are satisfactory and

workable.  They fear transfers to four-person cells at the new facility, which is designed for general

use in that manner, as is the other women's penal institution in Missouri, located in Vandalia.

The Vandalia facility was opened in 1998.  The three inmate witnesses testified to

experiencing physical and mental health hazards, as well as safety hazards, all of which they

associated with four-person cells at Vandalia.  There was no significant cross-examination,

impeachment, or contradiction by knowledgeable witnesses on cell configuration or experts in prison

design.  An Eighth Amendment cruel and unusual punishment allegation is pleaded.[1]  As a basis

---

[1]Support for this claim was most nearly presented by the third inmate witness, who
testified about a gross, continuing experience with another inmate who had been assigned to her
cell at Vandalia.

for pre-trial injunctive relief plaintiffs rely on a discrimination claim based on the general use of allegedly desirable two-person cells at all the male penal institutions built concurrently with the women's facilities (since about 1990). Equal Protection violations are asserted, and also a violation of Title IX of the Federal Civil Rights statute, requiring equal treatment in educational programs.[2]

I have supplied the parties with a post-hearing memorandum indicating I would probably deny pre-trial relief because no transfer to four-person cells is imminent. Doc. 40. I still hold the view stated in that memorandum, which is adopted here, and attached as an addendum. Further analysis, particular touching on legal issues, will be sketched out here in order to enter a formal ruling.

Defendants assert I should not be considering the merits because no internal grievances have been filed and because there are inherent dissimilarities between various penal institutions, particularly male and female institutions. I am not persuaded these contentions block further inquiry.

On the necessity of exhaustion of grievance procedures I agree that is not necessary where inmates seek equitable relief against the threat of future injury. Compare Harris v. Garner, 190 F.3d 1279, 1288 (11th Cir. 1999). Defendants argue that they are relying on Section 1997(e) (a) instead of Section 1997(e) (e) of Title 42, which was considered by the Harris court in saying that injunctive relief can be granted without showing physical injuries, as is required in a damage suit. If future harms can be enjoined without considering the statutory limitations on damages it would seem that

---

[2]Plaintiff Suter testified to considerable improvement in her study opportunities in a two-person cell at Chillicothe as contrasted with great difficulties with studies in a four-person cell at Vandalia.

Case 2:06-cv-04032-HFS   Document 47   Filed 09/07/06   Page 2 of 12

the requirement for exhaustion of administrative remedies for a prison conditions complaint should similarly be treated as a reference to actual, existing conditions rather than possible future conditions.[3]  The apparent concern in § 1997(e) related to damage suits, not protection from future harms not currently occurring.  If plaintiffs here have a claim to stop prison construction authorized by the General Assembly it is almost frivolous to imagine that an internal grievance might be effective.  D. Ex. K, 7/24/06, II K.  Justice Breyer's concurring opinion in <u>Woodford v. Ngo</u>, 126 S.Ct. 2368, 2393 (2006) suggests that the exhaustion rules be given realistic and practical construction, as in administrative law.  Nothing in the rationale of the principal opinion is inconsistent with the Breyer commentary.[4]

Defendants next argue that plaintiffs are not similarly situated with male inmates because they do not occupy the same facilities, and most prison facilities have dissimilar structures and operations.  Although there is some language in Eighth Circuit decisions that may suggest that approach, there has been a later disclaimer of a rule against comparing conditions at male and female institutions.  <u>Pargo v. Elliott</u>, 49 F.3d 1355, 1356 (8th Cir. 1995).  In other Circuits, moreover, such comparisons have been made, even to the extent of allowing litigation by a male inmate claiming more favorable facilities have been offered to women.  <u>Pitts v. Thornburgh</u>, 866 F.2d 1450 (D.C.

---

[3]In writing up grievance procedure time limits, the timing starts with some event or "incident" that is complained of, not some possible future harm.  D. Ex. K, 7/13/06, page 10, K(1).  This shows that authorities in charge of custody also read the grievance requirements as referring to past events.  I acknowledge, however, that in the <u>Woodford</u> opinion, infra, there are references to a "'threatened injury'" term in a case cited. 126 S.Ct. 2378, at 2385 and 2392.

[4]To avoid the possible frustration of an exhaustion issue being considered pertinent on appeal, plaintiffs might consider filing a grievance and then a new suit once it is denied.  Because of the timing here, this could surely be accomplished before there is any real danger of their being transferred to four-person cells in the new facility.

3

Cir. 1989); Yates v. Stalder, 217 F.3d 332 (5th Cir. 2000)(air conditioning and semi-private rooms). The Yates claim failed, but not because of standing. I do not rule out seriously considering structural and operational differences as justifications for different treatment but I am satisfied there is no blanket defense of an Equal Protection claim simply because women and men are not housed in the same institution.[5]

<center>*******</center>

The check-list of issues to be considered on preliminary injunction applications are (1) likelihood of ultimate success, (2) the threat of irreparable harm to movant, (3) the balance of harm in granting the motion, as between the parties, and (4) the public interest. Dataphase Systems, Inc. v. C.L. Systems, Inc., 640 F.2d 109 (8th Cir. 1981). As defendants point out, preservation of the status quo for a plaintiff until a trial is the general role of such an injunction. That will not need judicial intervention.

The less said the better on the issue of likely ultimate success is probably wise counsel, when a preliminary ruling is likely to depend on other factors. Recognizing that the court must remain flexible in its thinking, avoiding fixed prejudgments, some commentary on the likely merits may however be helpful to the parties in preparing for trial or a summary judgment motion. For example, I reiterate that proof for defendants beyond what I have heard is strongly invited, although I do not anticipate the need for a major trial.

---

[5]The VMI comparison with Mary Baldwin College was not brushed off by the Supreme Court by saying all colleges are different. United States v. Virginia, 518 U.S. 515 (1996), discussed in Women Prisoners of D.C. Dept. of Corrections v. District of Columbia, 93 F.3d 910 (D.C. Cir. 1996).

<center>4</center>

<center>(1) (A) Equal Protection</center>

Differences in treatment of male prisoners and female prisoners is a sensitive issue, hardly less so than racial discrimination. As the number of female prisoners rises, they may expect that enlarged facilities may provide greater similarities to prison facilities used by males, which are decentralized in Missouri and thus have capacities not strikingly different from those of women's prisons.

It is my impression from the evidence that the different cell configuration that is the focus of this litigation has not been subject to recent architectural review. None of the witnesses for defendants pointed to anything other than a decision to replicate Vandalia, designed a dozen years ago. Vandalia itself may be the product of design concepts for women that were worked out years before, hopefully after the major decisions on sex discrimination that were handed down some thirty years ago. At some point, however, someone must have decided that women's institutions were more suitable than men's prisons for predominantly four-person cells. The difference is unexplained. My best guess, not disputed by defendants' witnesses, would be that the larger cell pattern is somewhat less costly (in wall space and doorways) and probably female prisoners have been considered to be generally more docile, sociable and safer risks than men prisoners.[6]

The reader will recognize that a comparative propensity for violence, endangering other prisoners and predatory sexual activities may have been allocated by sex, based on general experience. If so we are treading on "gender profiling", a difficult subject both factually and legally.

---

[6]This rationale would be inconsistent with the testimony I heard that there is greater safety in the <u>larger</u> cells, which might suggest that men should be assigned to the new facility in Chillicothe and that a facility with cells for two persons might be sought for low risk female prisoners.

<center>5</center>

Shall it be assumed that women will not be suicide bombers?  Do we take chances and put some people at risk, in order to use limited resources as productively as possible?[7]

As the parties recognize, there is no case law requiring prison redesign to provide similarity of cell configuration for men and women.  Assigning women to four-person cells when similarly classified men are assigned to two-person cells would seem to be a legally dubious practice, if both types of cells can be constructed.[8]  Given the strong judicial policy of non-intrusiveness in administrative decisions at prisons, it seems unlikely that a district judge should stop prison construction now, however, particularly when less drastic remedies may be available to protect the assumed rights of plaintiff Suter and those who have joined her.[9]  The type of relief prayed for is not likely to be used, and the Equal Protection argument is thus deemed to be unlikely to success.

(1) (B)

The Title IX claim presents a narrower issue.  Does the requirement of equal education rights, between the sexes, include a protection of housing conditions for men and women prisoners?

---

[7]It may be that a favorable stereotype about women, permitting reduced expenditure for security, is the source of plaintiffs' difficulties (although poor institutional classification and handling of certain individuals may have been a contributing factor).  This conceivably provides a sound defense (or a vulnerable legal theory) but both the law and the facts remain undeveloped in this case.

[8]A good deal of statistical information has been supplied.  One purpose seems to be to indicate that the newer men's facilities are generally occupied by more dangerous (classification 5) individuals.  Plaintiff Suter and another witness have life sentences for murder, while the third has a conviction for kidnapping and I believe armed robbery.  Ms. Suter has a clean institutional record but is still classified as a 5.  It may be that the prison authorities discount the classification of women, as compared with men.

[9]The most recent local claim of discrimination asserted by female prisoners has not been favorably received by the Circuit.  Keevan v. Smith, 100 F.3d 644 (8th Cir. 1996).  While the issues are by no means comparable, the emanations and penumbra from Keevan are not favorable to this Equal Protection claim.

6

In particular, if small cells facilitate prisoner education, as plaintiff Suter testified to at the hearing, is she entitled to protection of that right when most similarly-classified male prisoners are housed in such small, two-person cells?

As plaintiffs point out in their "Bench Brief - - Title IX", to which defendants have not responded, prisons receiving federal funding have been held to be under a statutory duty to avoid sex discrimination in educational programs or activities. Klinger v. Dept. of Corrections, 107 F.3d 609 (8th Cir. 1997); Jeldness v. Pearce, 30 F.3d 1220, 1229 (9th Cir. 1994), citing 20 U.S.C. § 1681(a). Equality of housing apparently is covered by regulations; at least one court case indicates that such things as transportation to educational facilities must pass the test of non-discrimination. Women Prisoners of the Dist. of Columbia Dept. of Corrections v. District of Columbia, 877 F.Supp. 634, 677 (D.C.Cir. 1994), revd. in other aspects, Women Prisoners of the Dist. of Columbia Dept. of Corrections v. District of Columbia, 93 F.3d 910, 924, 927 (D.C.Cir. 1996).

On the assumption that out-of-class study facilities for women inmates and male inmates cannot be materially discriminatory (on an all-system basis, as required by Klinger), I see no legal requirement that such facilities be provided in a specific manner or that they be essentially identical. If plaintiff Suter might have study facilities in another institution substantially equal to those of men (who may generally use their own cells for studying) I cannot conclude that she would have a legal basis to demand cell-space for studying.

There was some limited debating at the hearing about likely ability to study outside the cell but I do not believe the record is adequately developed, or that it is fairly predictable what quality of study facilities will be available to Ms. Suter. As defendants contend, we cannot with certainty predict that she would occupy the new facilities, and it is even less predictable from the record

7

before me exactly what studying opportunities will be available to her if she is assigned a four-person cell.  I cannot conclude that the design and operational aspects of the new facility are so rigidly fixed at this time that one could conclude that a crowded cell would be the principle place where, as in Vandalia, Ms. Suter would be able to study.

There is no basis for this court to stop construction until there is clarification that adequate study facilities will be available at the women's facility in Chillicothe.  This litigation is sufficient notice to defendants of potential problems, and to make design alterations if legally necessary or simply as a matter of good prison administration.

(2) Threatened irreparable harm

The witnesses for plaintiffs satisfy me that they have cause for concern.  It also seems likely that current plans would be to transfer them to the new facility.  Even if I concluded, however, that, on the present record, they are entitled to protection the threat is not imminent.  An opportunity for trial and a final ruling will doubtless occur before completion of construction (or for summary judgment, if both sides have an adequate opportunity to prepare themselves).

A concern is expressed that delay in a court ruling would prejudice plaintiffs in their attempt to receive relief in equity, because it would be comparatively easy to halt construction now, and difficult to change plans or facilities after installation.  Defendants know, however, that they proceed at their own risk, and have been dramatically alerted to the claim for equal treatment.  There would be no equitable considerations favoring defendants if they proceed without taking into account the record before me and fail to make appropriate adjustments in planning, if legally required to do so or if sound policy favors modifications.

The threat to plaintiffs of irreparable harm during litigation is almost nonexistent.

8

<center>(3) Balance of Hardships</center>

Ordering construction to cease would be costly and would delay filling a need for more prison space.  No harm will be realized by plaintiffs during litigation.  The balance of hardships clearly favors defendants.

<center>(4) Public Interest</center>

There is no public interest consideration favoring plaintiffs as such.  Arguably the Missouri authorities should be using the opportunity of this litigation to make appropriate adjustments in operational plans or in construction.  This court has no paternalistic duty or authority to take action, however, particularly on the very limited record on pertinent issues that is before me.

For the foregoing reasons a preliminary injunction is DENIED.


<div style="margin-left:45%;">
/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE
</div>

September 7, 2006

Kansas City, Missouri


<center>IN THE UNITED STATES DISTRICT COURT FOR THE</center>

<center>9</center>

LISA SUTER,                          )
                                     )
      Plaintiff,                  )
                                     )
      v.                          )     Case No. 06-4032-CV-W-HFS
                                     )
STATE OF MISSOURI,                   )
                                     )
      Defendant.                  )

## MEMORANDUM TO COUNSEL

An early statement of my impressions and intentions may be useful, even though a formal ruling on the motion for a preliminary injunction may be delayed until close to or soon after the September 1 date on which construction might begin.

The most obvious impediment to legal relief is the nonexistence of any current problem facing the inmate witnesses. I would expect to rule any motion for summary judgment or to decide the merits after a final hearing some months before there might be transfers to the new Chillicothe facility for women offenders. My current appraisal of the evidence heard over several days may, however, provide guidance to the parties of a practical nature and for any further litigation.

The three inmate witnesses offered the most persuasive testimony about the comparison between two-person cells and four-person cells. Prison personnel were cautious and gave little meaningful testimony. The administrative personnel, while apparently experienced, well-motivated and competent, were so removed from in-cell conditions that their testimony was not very helpful. I recognize that the inmates were advocates and inclined to exaggerate somewhat, but they were basically credible and knowledgeable and had little stake in the litigation other than to retain

10

desirable cell conditions; that is, use of two-person cells, as designed and built currently for the men. If I were in administration I would be inclined, from what has been presented, to conclude that the design for Vandalia was defective and the proposed design for the new facility at Chillicothe is similarly flawed in the basic cell arrangement.

Whether a statutory or constitutional violation has occurred  or will occur is somewhat improbable.  The possibility should not, however, be shrugged off.

The most favorable testimony for defendants was on the safety issue.  I recognize a plausible argument that there is safety in numbers; that is, that a four-person cell gives more opportunity for protection of a prospective victim.  Plaintiff's theory that there is <u>danger</u> in numbers would be sound, however, if the victim is outnumbered by hostile people.  Also perhaps in conflict with the defense testimony is the failure to use four-person cells as a "protective device" for any group of male prisoners.

On physical and mental health issues (including the interest in a quiet environment), privacy interests, and for purposes of reading and correspondence and the like it would seem that the inmate testimony in favor of two-person cells for long-term use is very persuasive and essentially uncontested.  As presented, the current Chillicothe arrangement seems like the ideal layout.

Further initial comment may serve no good purpose.  The parties should expect a denial of injunctive relief during the pendency of the litigation and in advance of the completion of the new Chillicothe facility.

<div align="right">
/s/ Howard F. Sachs_____<br>
HOWARD F. SACHS<br>
UNITED STATES DISTRICT JUDGE
</div>

August 17, 2006

Case 2:06-cv-04032-HFS   Document 47   Filed 09/07/06   Page 11 of 12

Kansas City, Missouri

Case 2:06-cv-04032-HFS   Document 47   Filed 09/07/06   Page 12 of 12