IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

LISA A. SUTER, et al., )
)
        Plaintiffs, )
)
vs. ) No. 06-4032-CV-C-HFS
)
LARRY CRAWFORD, et al., )
)
        Defendants. )

MEMORANDUM AND ORDER

        Plaintiff Suter and almost thirty other long-term female inmates at the Chillicothe Correctional Center have been litigating for two years, seeking to avoid transfer to a newly constructed Chillicothe facility ("New Chillicothe") because they anticipate they will be assigned to undesirable four-person cells rather than two-person cells, as in the existing facility. They allege violation of Federal Constitutional and statutory rights.

        Suit was filed shortly before construction began. We now require a ruling because construction has been essentially completed, and transfers may be made as early as late November. I previously denied a temporary restraining order and a preliminary injunction primarily because plaintiffs were not exposed to any currently anticipated harm. To the extent considered appropriate I also offered tentative comment on the merits, from what could be assessed from a hearing. Suter v. State of Missouri, 2006 WL 2583731 (W.D.Mo.). I sought to alert counsel to issues that needed development and to suggest that State officials take another look at prison design. Recent prison construction for male prisoners has provided two-person cells, which the witnesses at the hearing persuasively testified from experience at Chillicothe was distinctly more desirable, from a safety and mental health standpoint, than the four-person cells

typical of the other women's prison in Missouri, at Vandalia. If New Chillicothe is occupied as planned, practically all female inmates in Missouri will live in circumstances distinctly different, and arguably distinctly inferior, from the housing generally used for males. Plaintiffs raise Equal Protection arguments, as well as Eighth Amendment arguments, and title IX arguments relating to equality of educational opportunities. 20 U.S.C. § 1681 et seq.

Summary judgment motions are also pending. More urgently needed, however, is a ruling on plaintiffs' claim to a preliminary injunction, which has now been briefed and argued. For reasons stated, a preliminary injunction will again be denied.

This ruling is based on the record of an earlier hearing and the subsequent gleanings from discovery, witness affidavits and briefing by the parties. It is governed by the familiar Dataphase test. Dataphase Systems, Inc. v. C.L. Systems, Inc., 640 F.2d 109 (8th Cir. 1981). I need to deal with (1) likelihood of ultimate success, (2) the threat of irreparable harm to movants, (3) the balance of harm in granting the motion, as between the parties, and (4) the public interest.

A "stay put" order, applicable to these plaintiffs, would surely have a disruptive effect on the prison system, but perhaps not a grievous effect if I could anticipate trial and a final ruling within perhaps six months. Absence of relief pending litigation may expose many of the plaintiffs to the adverse conditions they testified to at Vandalia. Such harm would be irreparable. Some problematic inmates will, however, be removed from the four-person cells at New Chillicothe; that is, those in "step down" (high security) status, administrative segregation and in the mental health units. Although the factual record is thin or nonexistent, I learn from oral argument that interim relief to these plaintiffs would probably cause the move to New Chillicothe to be delayed, which would leave an empty facility for some months, and would allow alleged

2

Case 2:06-cv-04032-HFS   Document 184   Filed 11/10/08   Page 2 of 8

overcrowding at Vandalia to be unrelieved.  These harms have not been adequately established, and I conclude that, on balance, factors (2) and (3) slightly favor plaintiffs.

The public interest somewhat favors defendants, in my judgment.  Disruption of the Missouri penal system by a federal judge should be reserved for clearly demanding situations.  Unlike the planning and budgeting issues, where some intervention is appropriate when constitutional rights are threatened, we are now dealing with management and administrative issues for the next six or eight months.  Although I conclude that factor (4) somewhat favors noninterference pending litigation, I would not really expect a great deal of harm to any plaintiff pending litigation, and the experience of the plaintiffs within the first weeks after transfer might clarify the issues with new evidence, favorable or unfavorable to relief.  My ruling here is ultimately governed by factor (1), my conclusion that, on the present record, plaintiffs' likelihood of success is very limited.

Turning to the merits, the easiest issue to predict is the Eighth Amendment claim of "cruel and unusual punishment."  This claim seems nearly frivolous, given the way prison condition cases have been ruled over the past forty years.  As I noted earlier, one of the witnesses did testify to a grossly obnoxious cell-mate at Vandalia.  Her complaint could be treated as an Eighth Amendment violation if it reoccurred and were not promptly corrected.  But an intolerable cell-mate in a two-cell situation might not be more easily handled, and the situation could be worse, because of the absence of potentially helpful cell-mates.  The likelihood of cruel and unusual punishment at New Chillicothe is so remote that it is not a factor favoring immediate relief.

Plaintiff Suter contends that her opportunities for study and self-education or productive

3

use of educational programs were crippled at Vandalia because of noise and turmoil in a four-person cell. Assuming arguendo that this would constitute a Title IX violation, because men can study more easily in a two-person setting, I need not explore the issue closely. Opportunity for study outside the cell may be provided at New Chillicothe. Disruptive cell-mates may be removed or not assigned to Suter and other studious inmates, assuming her continuing eligibility, which defendants question. See Grandson v. University of Minnesota, 272 F.3d 568 (8th Cir. 2001). The chance of a Title IX violation between now and a final ruling is so remote and speculative that it does not deserve any material weight at this time.

      The Equal Protection issue is thus clearly the dominant factor in analyzing the likely ruling on the merits. Over the past thirty years, since gender discrimination by public officials has been subject to substantial litigation, only a few cases relate to male-female prisoner comparisons, and hardly any relate to housing comparisons. See, e.g., Pitts v. Thornburgh, 866 F.2d 1450 (D.C.Cir. 1989) (inconvenient location); Yates v. Stalder, 217 F.3d 332 (5th Cir. 2000) (male inmate complaining about females enjoying air-conditioning and semi-private rooms); Wiley v. Trapp, 2004 WL 201453 (D. Kan.) (male work release inmates not confined to individual cells, as female plaintiff was). This case apparently presents the first legal challenge to multiple-inmate cells, although I can only suppose from the record here that they are rather commonly used, at least for prisoners with low classifications for serious or violent criminal records. It has been stated that it is violative of equal protection rights for females to be housed under conditions substantially inferior to those of male prisoners (Cooper v. Morin, 398 N.Y.S.2d 36 (N.Y.Supp. 1977)) but plaintiffs do not cite, and I am unable to find, any case-law granting relief in a prison setting that is in any way comparable to the claim here.

4

Case-law in the Eighth Circuit poses unusually difficult problems for the Equal Protection contention. Klinger v. Department of Corrections, 31 F.3d 727 (8th Cir. 1994). Because of prison population differences, variances in average sentences of inmates and their different security levels, Klinger rejected claims that women prisoners and the male inmates at another facility were substantially similarly situated so as to require comparable programs and services. See also Keenan v. Smith, 100 F.3d 644 (8th Cir. 1996). Similarity of cell occupancy plans and rules would seemingly be required only if there were an initial showing that the inmate populations are substantially similar, except for gender.[1]

In my prior approach I noted, with plaintiffs, that modern prison construction in Missouri suggests that male inmates are best housed in two-person cells. Discovery, briefing, and rethinking now establish that the average security classification of the men housed in the new male facilities is distinctly higher than the average classifications for the women in Chillicothe or Vandalia–Level 5, as contrasted with Level 2. Sentences are, on average, longer for the men. Violence in the male records is more than double the violence rates for the women. This phenomenon has been considered in the case-law. Pargo v. Elliott, 894 F. Supp. 1243, 1254-61 (S.D. Iowa 1995). If safety needs most compellingly suggest use of two-person cells, the male inmates, on average, need such cells more than the women inmates do. While plaintiffs object to "stereotyping" by gender, the cases routinely make these comparisons.[2]

---

[1] I agree with plaintiffs that population differences may not be pertinent here, as they were in Klinger, but average classification level differences may be even more important here, as they were in privacy discrimination claims by men in Timm v. Gunter, 917 F.2d 1093, 1102 (8th Cir. 1990).

[2] I remain aware that Ms. Suter has a high classification number but a good prison record.

5

Defendants' contention of lack of similarity has further support in that Ozark Correctional Center at Fordland (OCC), a minimum custody level institution, uses "multiple-person housing" for the majority of the male inmates, who, like the women, are generally classified at Level 2. Official Manual, State of Missouri (2005-2006) p. 387, Def.Sugg.Opp., page 34.[3] Analysis of cell assignments at five minimum security male facilities shows considerable variation. Only a small minority of Level 2 male inmates are housed in "semi-private" two-person cells. Clements Affidavit (Exh. UU) and Exhibits H and J, supra. If relief were granted as prayed, apparently many men would have a plausible claim of discrimination.

I confess some dissatisfaction with the record offered by plaintiffs and supplied by defendants. The historic reason for the four-person cell design has not been rigorously pursued. New Chillicothe's four-person cells seem not to have been seriously deliberated, but merely adopted because there was an effort to replicate Vandalia. Vandalia, in turn, was originally planned to have two-person cells, but some unknown person or persons changed this to the controversial four-person cell system. The rationale of the architects in the mid-1990s, or of the Design and Construction unit of the Office of Administration, which was responsible for the facility, is left in mystery. See Official Manual, page 342.

A best guess, at this time, would be that the women on average were deemed to create less serious security problems than the male inmates, and thus the cells were designed to accommodate a larger cluster, as at Fordland. One may question, however, that identification of noisy and obnoxious cell mates can be correlated with the classification system now in use.

---

[3] For present purposes I accept the factual statement in the brief, although the record source is not clear. See Def. Exhs. H and J, filed Sept. 26, 2008, in support of motion for summary judgment.

However much I may doubt the soundness of doubling cell size and occupancy, which has no articulated advantage, such as reduced cost or improved lifestyle for inmates, it is not a decision that qualifies for condemnation or even consideration as a constitutional violation, on the present record, using Klinger as a guide. The high classification male inmate prisons do not serve a substantially similar population, and if the low classification male prisoners are considered reasonably comparable, they are not generally housed in two-person cells.

Plaintiffs offer an argument that truly arbitrary classifications should be invalidated, even if one is unable to treat the high classification male inmates as a substantially similar group of people. See Parham v. Hughes, 441 U.S. 347, 357 (1979). From what has been said above, it would not seem plainly arbitrary to treat the women, as a group, more like the Fordland inmates than the male inmates in the higher classification prisons. The unexplained decision, both for Vandalia and New Chillicothe, still looks to me like a mistake, possibly a very serious one, but not of constitutional dimensions. I recognize that the information supplied the design group by Vandalia officials apparently was that Vandalia was quite satisfactory, and should be replicated. Two arguable mistakes in judgment, however, would fall short of being arbitrary, in a constitutional sense.

I retain an obligation to keep an open mind, if I advance this case for trial. But it must be currently concluded that plaintiffs' likelihood of success in seeking two-person cells is rather poor, even if I accept plaintiffs' theory that gender discrimination in prison design for comparable persons would be subject to "heightened scrutiny." The claim presented is certainly
7

not so compelling as to authorize relief at this time.[4]

    The renewed motion for a preliminary injunction (Doc. 144) is therefore DENIED.

                                   /s/Howard F. Sachs  
                                   HOWARD F. SACHS  
                                   Senior United States District Judge

Dated: 11/10/2008

---

[4] In making this ruling I need not consider defendants' additional point that plaintiffs need to establish purposeful discrimination and have failed to do so. See the dissent and the majority decision in Klinger.